NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MYOS CORPORATION,**<br><br>Plaintiff,<br><br>v.<br><br>**MAXIMUM HUMAN PERFORMANCE, LLC and GERARD DENTE,**<br><br>Defendants. | Docket No.: 15-448<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on Plaintiff Myos Corporation's motion for a preliminary injunction against Defendants Maximum Human Performance LLC ("MHP") and Gerard Dente. Plaintiff seeks to enjoin Defendants from using the trademark "4D-TROPIN," an MHP-branded muscle-growth supplement. Plaintiff seeks this injunction on the grounds that "4D-TROPIN" infringes on Plaintiff's trademark, "FORTETROPIN." A hearing occurred on February 5, 2014. For the reasons set forth below, the motion is **DENIED**.

## I.    BACKGROUND

This case involves commercial sale of a myostatin inhibitor. Myostatin is a protein that the human body secretes naturally. Myostatin suppresses muscle growth. Myostatin inhibitors reduce the impact of myostatin in the human body, thereby allowing the body greater potential to build muscle. The particular myostatin inhibitor at issue in this case has the generic name follistatin. Scientists have known that follistatin was a myostatin inhibitor since 1987.

Plaintiff Myos acquired a patent for a method of producing follistatin from fertilized chicken eggs. The patent only protects this method of producing follistatin. Myos alleges that its patented egg-based follistatin is its only patented product and is crucial to the success of Myos's business.

Since 2012, Myos has owned the trademark "MYO-T12," a compound which has Myos's patent-produced follistatin as the main ingredient. On October 24, 2013, Myos filed a trademark application for the follistatin itself. The trademark sought is "FORTETROPIN."

Defendants are Maximum Human Performance LLC ("MHP") and MHP's CEO, Gerard Dente. MHP is a distributer of supplements marketed to body-builders and athletes. MHP sells approximately seventy-five different products that are intended to increase the efficacy of an athlete's workouts in different ways. This case involves two of MHP's products: MYO-X, which contains FORTETROPIN, and 4D-TROPIN, which contains no myostatin inhibitor.



MYO-X has been on the market since 2012. The active ingredient in MYO-X is Myos's FORTETROPIN-containing MYO-T12. Pursuant to a Distribution Agreement dated May 16, 2012, Myos has been supplying MHP with MYO-T12.[1] Pursuant to the Distribution Agreement, MHP is the exclusive provider of marketing, sales, and distribution of MYO-T12 in the sports nutrition retail category. (Dente Decl., Exhibit 2).

The word "MYO-X," written in large script, with the words "Myostatin Inhibitor" in prominent subscript are displayed prominently on the trade dress of MYO-X. (ECF No. 16). In the bottom right hand corner of the box's front side is the phrase "Powered by MYO-T12." "MYO-T12" is in a colorful font that is large

---

[1] The Distribution Agreement has been renewed one time. The renewed Agreement expires in March 2015.

in relation to the size of the overall area allotted to the bottom right corner of the box.  Only recently, Myos demanded that the word "FORTETROPIN," written in a small white font, be placed in parentheses under "MYO-T12."  Only 50 boxes with the word "FORTETROPIN" on the box have been produced.

MHP released 4D-TROPIN in January 2015.  4D-TROPIN is a formulation of "clinically tested anabolic agents to augment four of the body's most powerful muscle growth activators."  (Declaration of Gerard Dente ("Dente Decl."), Exhibit 9).  Those activators are testosterone, growth hormone ("GH"), insulin-like growth factor ("IGF-1") and mammalian target of rapamycin ("mTor").  Another important aspect of the 4D-TROPIN formulation are agents that promote restful sleep.  (Dente Decl., Exhibit 9).  4D-TROPIN is not a myostatin inhibitor and does not claim to be.

MHP owns the trademarks "MYO-X" and "4D-TROPIN."  The retail price of MYO-X is about $100 per bottle.  The retail price of 4D-TROPIN is about $70 per bottle.  According to the representation of MHP at the hearing, MYO-X sales in 2014 were $1.4 million.  MHP reports that MYO-X only accounts for 1.7% of its sales.  (Dente Decl. at ¶ 18).

There is only one other product available anywhere on the market that contains FORTETROPIN, Cenegenics Muscle Formula.  (*See* Dente Decl., Exhibit 7).  The Cenegenics product has a different target market than MYO-X and 4D-TROPIN.  Cenegenics targets its Muscle Formula to seniors combatting sarcopenia, which is age-related muscle loss.



In July 2014, scientists at the University of Tampa and Auburn University finished a study called "The Effect of Fortetropin Supplementation on Body Composition, Strength, Power in Humans and Mechanism of Action in a Rodent Model."  (ECF No. 12).  Myos funded the human part of the study.  The study found that use of FORTETROPIN was safe and effective in humans.  (ECF No. 12).  The study appears to be unpublished, however, one of the authors, along with four Myos employees, reduced the study into a white paper dated August 6, 2014 called "The Effect of Fortetropin™ on Muscle."  (ECF No. 12).  The white paper is available on Myos's website.

Myos also states that an August 2014 article in the *Wall Street Journal* publicized "MYO-X with FORTETROPIN" as one of MHP's "top sellers." (Myos's Brief at 7). In fact, that article does not mention Myos or FORTETROPIN. The article, which is titled "Maximum Human Performance Goes on the Auction Block," just mentions that one of "MHP's top sellers" is "MYO-X, a muscle-building formula." (Declaration of Peter Levy ("Levy Decl."), Exhibit 6). MHP CEO Gerard Dente denies that MYO-X was one of MHP's top sellers and states that no one from MHP spoke to the *Wall Street Journal* about MYO-X.

On October 31, 2014, Myos sent MHP an email stating that it did not intend to renew the exclusive Distributor Agreement. The email informed MHP that Myos would stop supplying MHP with MYO-T12 on March 3, 2015, the date when the Distributor Agreement expired. (Dente Decl., Exhibits 5-6). MHP later discovered that Myos was planning to launch its own line of FORTETROPIN-containing products. (Dente Decl. at ¶ 40).

## II.  LEGAL STANDARD

Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). In considering a temporary restraining order or preliminary injunction, district courts weigh the following four factors: (1) the likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *Winters v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief. *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 192 (3d Cir. 1990). In this case, the Plaintiff fails to produce evidence persuasively demonstrating that all four factors weigh in favor of the preliminary injunction.

## III.  DISCUSSION

### A.  Likelihood of Success on the Merits

In order to prevail on its trademark infringement claim, Myos must "prove both its ownership of a valid and legally protectable trademark and a likelihood of confusion caused by" MHP's use of the 4D-TROPIN mark. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 181 (3d Cir. 2010).  While Myos probably has a valid and protectable mark, there is no likelihood of confusion.

#### *1.  Myos probably has a protectable mark.*

Having a trademark that is registered with the USPTO gives a party the presumption of valid ownership of the mark.  *House of Westmore v. Denney*, 151 F.2d 261, 265 (3d Cir. 1945); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir.) *as modified,* 97 F.3d 1460 (9th Cir. 1996).  The USPTO seems on track to register the "FORTETROPIN" trademark.  The application was filed.  No one has opposed the registration of the mark.  The USPTO issued a "Notice of Acceptance of the Statement of Use," which states that the USPTO "will now register."  If registration has not occurred already, it seems imminent.

#### *2.  Myos has not established a likelihood of confusion between the 4D-TROPIN and FORTETROPIN marks.*

Even if the FORTETROPIN mark were valid and protectable, Myos has not demonstrated a likelihood of confusion between 4D-TROPIN and FORTETROPIN.  While the two do sound similar phonetically, and they are both muscle-growth supplements, all other factors indicate a low likelihood of consumer confusion.

To determine whether there is a likelihood of confusion between two marks, courts in the Third Circuit apply a "non-exhaustive test using 10 factors that have come be known as the *Lapp* factors."  *Freedom Card Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005) (*citing Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983)).  The factors to be considered are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;

    (2) the strength of the owner's mark;

    (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

    (4) the length of time the defendant has used the mark without evidence of actual confusion arising;

    (5) the intent of the defendant in adopting the mark;

    (6) the evidence of actual confusion;

    (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

    (8) the extent to which the targets of the parties' sales efforts are the same;

    (9) the relationship of the goods in the minds of consumers because of the similarity of function;

    (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* (*citing Lapp*, 721 F.2d at 463). "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." *Sabinsa Corp.,* 609 F.3d at 182-83 (*quoting Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001)). A district court should use the factors that seem appropriate in the situation. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000).

    In this case, the weakness of the FORTETROPIN mark is the key factor. "To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." *Sabinsa Corp.*, 609 F.3d at 184-85. Neither factor supports a conclusion that FORTETROPIN is a strong mark, but the key weakness here is lack of marketplace recognition.

In *Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F. Supp. 182, 189 (D. Del. 1993), the district court wrote a concise summary of the types of marks and their relative inherent strengths:

> Marks are classified along a spectrum of distinctiveness which ranges from "fanciful" and "arbitrary" marks at one end, to "suggestive" and "descriptive" marks, and finally to "generic" marks at the other end. Fanciful marks are words coined for the sole purpose of functioning as trademarks. Arbitrary marks are words which enjoy common usage, but are chosen so as to neither suggest nor describe any ingredient, quality or characteristic of the underlying good or service. Suggestive marks also enjoy common usage, but they do suggest the underlying good or service, requiring imagination, thought and perception to reach a conclusion as to the nature of the good or service. By contrast, descriptive marks immediately convey the intended purpose, function or use of the goods; the size of the goods, the class of users of the goods, a desirable characteristic of the goods, or the end effect upon the user. No imagination is required. Generic terms can never be used as marks.

*Id.* at 189 (internal quotations and citations omitted).

FORTETROPIN is a suggestive mark. It is the creative fusion of two uncommon yet generic terms that describe the product: (1) "FORTE" means "strength" or "strong point" and (2) "TROPIN" is a generic term for "hormone." (*See* Declaration of Nicholas Geiger at ¶¶ 8-9; Exhibits G-H). There are many products that contain the word "forte" as a prefix or "tropin" as a suffix. (*See* Defendant's Brief at 28). Thus, the mark has moderate inherent strength.

Of far more importance however, the term FORTETROPIN barely exists in the sports nutrition retail market. With the exception of the last 50 bottles of MYO-X to be produced, the FORTETROPIN mark has never appeared prominently on the trade dress or labeling of *any* sports nutrition product. (ECF No. 13). A review of the materials submitted to the Court indicate that Myos was relying totally on the MYO-T12 trademark for most of its history.

Myos raises the University of Tampa study, released in late 2014, as evidence of FORTETROPIN's market strength. While this study appears to have excited Myos's interest in launching its own brand of products containing the FORTETROPIN trademark, there is no evidence that the mark has made any meaningful traction in the sports nutrition retail market. In the record that was

present before the Court at the time of the hearing, all references to clinical studies used the terms "MYO-X," "MYO-T12" or simply the generic "myostatin inhibitor" to refer to Myos's product.[2]

Myos also raised the August 2014 *Wall Street Journal* article as evidence of FORTETROPIN's traction in the market. This article does not support Myos's proposition at all. That article never mentions FORTETROPIN, Myos, myostatin inhibitors, or clinical studies.

In sum, the only place to find the word FORTETROPIN as a brand identifier in the sports nutrition retail market is a small word in parentheses on 50 bottles of MYO-X.[3] There is no evidence that sports nutrition experts or consumers are using the word FORTETROPIN with any meaningful frequency.

Additionally, because the only place that consumers in the sports nutrition retail market have heretofore become familiar with FORTETROPIN is from MHP's MYO-X, it is highly unlikely that people who have had an experience with MYO-X will confuse it with a different MHP product.

The price of both products is another market factor that makes confusion unlikely. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Sabinsa*, 609 F.3d at 186 (*citing Checkpoint Sys.*, 269 F.3d at 284).

MYO-X and 4D-TROPIN are about $100 and $70 per bottle respectively. At these prices, it is unlikely that any consumer would purchase either product so mindlessly as to mistake one for the other. Even accounting for some phonetic similarity, a mistaken purchase is unlikely because the 4D-TROPIN bottle explains the meaning of its name very clearly. On the bottle, the subscript of "4D-TROPIN"

---

[2] On February 6, 2015, the Court requested a copy of the University of Tampa study from Plaintiff's Counsel. This was provided to the Court and added to the record via letter. (ECF No. 12). On February 6, 2015, the Court also asked Defendants' counsel to provide copies of each surface of two MYO-X boxes: one without FORTETROPIN on it, and one with FORTEROPIN on it. This was provided to the Court and added to the record via letter. (ECF No. 13). Defense counsel had displayed both boxes to the Court at the hearing.

[3] The word FORTETROPIN also appears on the nutrition label of the last 50 boxes of MYO-X that were produced. The last 50 boxes of MYO-X also state in small script below the nutrition label that "FORTETROPIN™ is a trademark of Myos Corporation, used by permission." (*See* ECF No. 13).

8

says "4 Dimensional Muscle Growth Activator," and underneath, it prominently explains the four dimensions:

> -Increases GH up to 321%
> -Increases IGF-1 up to 24%
> -Increases Testosterone
> -Tri-Plex mTOR Activation Technology[4]

(Dente Decl. at ¶ 81).

The 4D-TROPIN bottle says nothing of myostatin. Given the extremely meager penetration of the FORTETROPIN mark into the sports nutrition retail market, it is highly unlikely that a person seeking FORTETROPIN for its myostatin-inhibiting properties would erroneously think that 4D-TROPIN, the "4 Dimensional Muscle Growth Activator" is a myostatin inhibitor. Between the high cost and the clear labeling, it is unlikely that a consumer would erroneously purchase 4D-TROPIN thinking it was FORTETROPIN.

The intent factor of the *Lapp* test also sways in Defendants' favor. Defendants have supplied e-mails demonstrating that the name 4D-TROPIN developed organically, during August 2014, as individuals at MHP considered how to communicate the various properties of 4D-TROPIN in the most marketable way. (*See* Dente Decl., Exhibit 10). Given the content of these e-mails, along with the totality of the surrounding circumstances, MHP's alleged plot to foil the success of Myos-branded FORTETROPIN products seems highly unlikely. This is all the more true given that MHP did not learn of Myos's intent to sever its relationship with MHP until October 31, 2014, several months after MHP selected the 4D-TROPIN trademark. Until that date, both companies essentially had a common interest in the success of FORTETROPIN. That MHP would intentionally try to create confusion with a product that was its own for all practical purposes is not believable.

The Plaintiff argues the phonetic similarity of the marks could be a source of confusion. We acknowledge that the phonetic similarity might cause some initial confusion, depending on the way the speaker pronounces the two marks and the speed at which they are spoken. The two marks also both signify chemicals designed to build muscle. But similarities of the marks end there. The two products do not share any similar active ingredients, they work completely differently, and they can

---

[4] The front of the 4D-TROPIN bottle also states that it "promotes anabolic sleep." (Dente Decl. at ¶ 81).

9

be used in conjunction with each other without duplicating nutritional supplementation.

Plaintiff urges the Court to find an analogy to the Third Circuit's decision in *Kos Pharmaceuticals v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004). In *Kos Pharmaceuticals*, the Third Circuit found that there was a likelihood of confusion between two cholesterol-lowering drugs, ADVICOR and ALTOCOR. Both of these drugs contained the same cholesterol-lowering ingredient, but one of them contained niacin. Niacin increased the beneficial properties of the drug for some patients, but for others, it could be ineffective or harmful. Moreover, Kos Pharmaceuticals was able to show at least 60 instances of customer confusion. The instant case is distinguishable for several reasons.

First, the marketplace for prescription drugs is much different than the marketplace for nutritional supplements. In the market for prescription drugs, reliance on doctor expertise and payment by insurance companies erodes consumer vigilance. A prescription bottle would tell a consumer nothing of ADVICOR or ALTOCOR's chemical properties or intended use. Oral or visual confusion can therefore lead to consumers ingesting the wrong drug, with possibly dire consequences. The sports nutrition supplements at issue in this case have packaging crammed with information about their contents and what those contents do to the body. Moreover, there is no evidence of potential bodily harm to a consumer who took FORTETROPIN or 4D-TROPIN after confusing the two.

The risk of visual confusion between the words 4D-TROPIN and FORTETROPIN is less likely than the risk of visual confusion between ADVICOR and ALTOCOR because of the visually distinct prefixes, "4D" and "FORTE."

Also, 4D-TROPIN and FORTETROPIN are not really in the same category of goods in the way that ADVICOR and ALTOCOR are. FORTETROPIN is only an ingredient found in other products. 4D-TROPIN is the name given to one particular collection of several ingredients designed to increase four muscle growth factors. ADVICOR and ALTOCOR contained the same active ingredient, thereby increasing the likelihood of mistaken ingestion of the wrong one.

Moreover, FORTETROPIN is not in direct competition with 4D-TROPIN in the way that ALTOCOR and ADVICOR were because FORTETROPIN and 4D-TROPIN do not function in the body in the same way. The end result of using FORTETROPIN or 4D-TROPIN may be the same (muscle growth), but an athlete might elect to take both in order to stimulate the 4 muscle growth factors that 4D-

10

TROPIN stimulates and get the benefits of myostatin inhibition. No one would take both ALTOCOR and ADVICOR.

Finally, there was technically no evidence of consumer confusion on the record. In the reply brief, Plaintiff inappropriately submitted for the first time, one shred of evidence from cyberspace which may or may not represent customer confusion. A week after the launch of 4D-TROPIN (January 27, 2015), an MHP customer, Jeff Johnston, posted on Instagram that he was "Looking forward to the benefits this product has shown in clinical testings . . . ." Plaintiff argues that this post suggests the customer confused the 4D-TROPIN product with the representations on MHP's webpage for MYO-X, which has a large, bold heading stating, "Clinically shown to build muscles."





At the same time, it is not clear that Johnston has actually confused the two products.  Website materials note that the ingredients in 4D-TROPIN have all been clinically tested.  (Dente Decl., Exhibit 9).

12

"[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir. 1990) (citation and quotation omitted); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed. 2003) ("The status quo to be preserved is not the situation of contested rights . . . In a trademark case, [it] is the situation prior to the time the junior user began use of its contested mark: the last peaceable, non-contested status."). In this case, not granting the preliminary injunction would not alter the status quo. Currently, the term FORTETROPIN is virtually unknown in the sports nutrition market. Thus, the existence of 4D-TROPIN is not likely to cause any confusion with virtually unknown FORTETROPIN.

### B. Irreparable Harm

Even if Myos were to establish a likelihood of success on the merits, Myos must still affirmatively establish irreparable harm in order to obtain a preliminary injunction. *Buzz Bee Toys, Inc. v. Swimways Corp.,* 20 F.Supp. 3d 483, 511 (D.N.J. 2014) ("Although the Third Circuit has not yet examined this issue, other circuit courts and district courts in this circuit have held that . . . irreparable harm must be established as a separate element, regardless of whether a plaintiff has shown infringement."). The "irreparable harm must be likely, not merely possible." *Id.* at 511 (denying motion for preliminary injunction based on trade dress infringement claim under the Lanham Act against competitor). Myos's evidence of irreparable harm is weak. As of yet, Myos has no line of FORTETROPIN-containing supplements in the sports nutrition market other than MYO-X. Thus FORTETROPIN has little public trademark recognition that 4D-TROPIN could possibly dilute.

### C. The Balance of Hardships

The balance of hardships does not support Myos's position. MHP's 4D-TROPIN has just been launched, and MHP is in the process of building consumer awareness of 4D-TROPIN. A similar situation was addressed in *J & J Snack Foods Corp. v. Nestle USA, Inc.,* 149 F. Supp. 2d 136 (D.N.J. 2001). In *J & J Snack Foods*, the court declined to enter a preliminary injunction against Nestle for a new product, prescored Toll House cookie dough. The Court found that "if the defendants were incorrectly preliminarily enjoined now, their ability to be restored would be conjectural and unlikely, given the interruption in sales, loss of good will,

destruction of unsold product, and necessity for start-up efforts, all of which may never regain defendants' evident product momentum." *Id.* at 159.

The parties in this case have already learned this lesson. In the early days of MYO-X, problems with production resulted in demand not being met. This led to the product being taken off the shelves of some retailers all together for the 2nd-4th quarters of 2013. (Dente Decl. at ¶ 18). Gerard Dente, MHP'S CEO stated, "Myos was eventually able to make more of the MYO-X product, but the damage to MYO-X's sales . . . has proved very problematic, and since mid-2013 MYO-X has hovered around 1.7% of MHP's total sales." (*Id.*).

Meanwhile, Myos does not currently sell its own FORTETROPIN-branded line of sports nutrition products, and to the extent that it intends to do so, it has not adequately shown why a planned product launch would be harmed by 4D-TROPIN, a product that does not directly compete with FORTETROPIN. Therefore, the balance of hardships tips strongly in MHP's favor.

### D.  The Public Interest

The public interest is not a significant factor here. The only public harm alleged is consumer confusion of FORTETROPIN and 4D-TROPIN, but confusion is unlikely. Moreover, any confusion that did happen would not cause any significant harm to one who was confused. On the other hand, if the Court did enjoin the production of 4D-TROPIN, the public would lose access to 4D-TROPIN until the resolution of this dispute, which could be years from now. Therefore, Plaintiff fails to demonstrate that the public interest weighs in its favor.

### IV.  <u>CONCLUSION</u>

Because the four factors weigh in favor of the Defendants, the Plaintiff's motion for a preliminary injunction is denied. An appropriate order follows.

/s/ William J. Martini
_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: February 19, 2015**